UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ERIC YBARRA | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CAUSE OF ACTION NO. |
| | § | 1:19-cv-1099 |
| DEREK DAVIS, in his individual capacity, and BASTROP COUNTY | § | |
| | § | |
| Defendants | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Eric Ybarra brings this 42 U.S.C. § 1983 case against Defendants Bastrop County and Derek Davis, a deputy of the Bastrop County Sheriff's Department, because Davis illegally entered Ybarra's property and used brutal excessive force on him.

### I.  PARTIES

1. Plaintiff Eric Ybarra is a resident of Bastrop County, Texas.

2. Defendant Derek Davis is a sheriff's deputy at the Bastrop County Sheriff's Department. Davis is sued in his individual capacity for compensatory and punitive damages. He can be served with process at 200 Jackson Street, Bastrop, Texas 78602. At all relevant times, Deputy Davis was acting under color of law as a Bastrop County Sheriff's Department officer.

3. Defendant Bastrop County is a Texas municipality. It can be served with process through its County Judge, Paul Pape, at 804 Pecan St., Bastop, TX 78602. For all policies related to law enforcement, Bastrop County Sheriff Maurice Cook was the county's policymaker at all relevant times.

## II.     JURISDICTION AND VENUE

4. This Court has federal question jurisdiction over this 42 U.S.C. § 1983 action pursuant to 28 U.S.C. §§ 1331 and 1343.

5. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(1), as all relevant events occurred in this division, and all Defendants reside in this state.

## III.     FACTS

6. After illegally entering Plaintiff Ybarra's property to make an arrest for an expired driver's license, Defendant Davis handcuffed Ybarra, put him in a choke hold, and threw him to the ground.

7. Davis then held Ybarra on the ground as Ybarra begged "I can't breathe," breaking three of Ybarra's ribs.

8. Ybarra and his girlfriend were returning to his home in rural Bastrop County. Ybarra stopped his motorcycle to open the gate to his property, then left his girlfriend to close and lock the gate while Ybarra parked the motorcycle next to his house.

9. While the couple was stopped at the gate, a Bastrop County Sheriff's Department squad car driven by Defendant Davis passed by.

10. Davis believed the Ybarra's driver's license was expired, and decided to arrest Ybarra for this trivial offense.

11. Circling back around, Davis stopped his squad car at the property's entrance gate. Finding the gate was closed and locked, Davis began yelling at Ybarra's girlfriend.

12. Davis told Ybarra's girlfriend to open the gate, and she responded she did not have the key, and would have to retrieve it from the house. She then walked toward the house to tell Ybarra what was going on, and to retrieve the key.

13. Ybarra heard his girlfriend arguing with Davis, and left his house to see what was going on.

14. As Ybarra approached the fence where Davis and the girlfriend were arguing, Davis demanded that Ybarra produce his identification.

15. The law does not require a person who has not already been arrested to produce any identification, as any competent law enforcement officer would know. *See* TEX. PENAL CODE § 38.02.

16. Ybarra could not comply with Davis' request because he had just left his identification inside his house. As the law did not require him to provide Davis identification, Ybarra did not.

17. Davis then jumped over the fence to approach Ybarra.

18. No one had consented to Davis entering the property, Davis had no warrant to enter the property, and there were no exigent circumstances justifying entering the property without first obtaining a warrant. In fact, no one was in any danger whatsoever before Davis jumped the fence, and no reasonable officer could have believed that any evidence would be destroyed if Davis did not enter the property without first obtaining a warrant.

19. Ybarra correctly informed Davis that his actions were illegal, that Davis was breaking the law, and that Davis needed to leave Ybarra's property. Instead of complying with Ybarra's requests, however, Davis again demanded to see Ybarra's identification.

20. Ybarra again – completely within his legal rights – declined to produce identification.

21. When Davis refused to leave, Ybarra asked to speak with Davis's supervisor.

22. Rather than do that, Davis grabbed Ybarra's arm and told Ybarra he was under arrest. Ybarra complied by putting his hands behind his back, and Davis handcuffed him.

23. Davis then perp-walked the handcuffed Ybarra back to the squad car, which was parked on the other side of the locked gate. As they walked this short distance, Ybarra continued telling Davis that his actions were illegal, and that Davis was violating Ybarra's constitutional rights.

24. As they approached the fence, Davis concluded that he would need a key to open the gate to the fence so that he could exit the property he had illegally entered. Davis asked Ybarra for the key, and Ybarra responded that he did not have the key, it was inside his home.

25. Davis knew that Ybarra's girlfriend had left the scene to retrieve the key, and was likely to return shortly.

26. As Ybarra continued to tell Davis that he had illegally entered the property, Davis put his arm around Ybarra's neck, and threw Ybarra to the ground.

27. Davis then climbed on top of the handcuffed Ybarra, screamed at him, and pressed Ybarra's chest into the ground.

28. Davis screamed "stop resisting!" even though Ybarra was not resisting at all.

29. In fact, Ybarra calmly responded to Davis' sham by saying, "Dude, I didn't resist at all."

30. Even when Davis forcibly leaned into Ybarra's chest, Ybarra calmly asked, "can you get off me, please?"

31. Davis then continued pressing Ybarra's chest down into the ground, and Ybarra repeatedly asked "officer, please get off me? I can't breathe."

32. Not until after Davis senselessly broke three of Ybarra's ribs, did Davis finally relent and relieve the enormous pressure on Ybarra's chest.

33. Ybarra suffered intense physical pain and harm as a result of Davis' actions.

34. Upon information and belief, Bastrop County's sheriff's office has not disciplined Davis, and believes he acted appropriately.

35. Upon information and belief, Davis acted in accordance with the training he received from Bastrop County.

36. Upon information and belief, Davis acted in accordance with the policies, practices, and customs of Bastrop County.

### IV.   CAUSES OF ACTION

**A. FOURTH AND FOURTEENTH AMENDMENT EXCESSIVE FORCE – AS TO DEFENDANT DAVIS ONLY**

37. Defendant Davis, while acting under color of law, brutally tackled Plaintiff Ybarra by the neck when Ybarra posed no danger to anyone, and was cooperating with the police.

38. Davis' use of force was wholly excessive to any conceivable need, objectively unreasonable in light of clearly established law, and directly caused Ybarra to suffer serious injuries. Therefore, Davis' actions violated Ybarra's clearly established Fourth Amendment right to be free from excessive force and unreasonable seizure.

39. As a direct and proximate result of Davis' actions, Ybarra suffered and continues to suffer significant injuries.

40. Ybarra brings this claim pursuant to 42 U.S.C. § 1983.

**B. FOURTH AND FOURTEENTH AMENDMENT ILLEGAL ENTRY – AS TO DEFENDANT DAVIS ONLY**

41. Defendant Davis had no warrant allowing him to enter onto Plaintiff Ybarra's land.

42. No one with apparent control over the property consented to Davis entering Ybarra's land.

43. No exigent circumstances – such as danger to any person or the imminent destruction of evidence – was present to justify Davis' entry onto Ybarra's land.

44. Nonetheless, Davis jumped over Ybarra's fence, illegally entering Ybarra's property, in violation of Ybarra's Fourth and Fourteenth Amendment rights.

45. Even after Ybarra informed Davis that he had illegally entered the property, Davis still did not leave.

46. As a direct and proximate cause of Davis' illegal entry onto Ybarra's land, Ybarra suffered significant damages and harm.

47. Ybarra brings this claim pursuant to 42 U.S.C. § 1983.

C. **First Amendment Retaliation – as to Defendant Davis Only**

48. The First Amendment's protections for speech prohibit agents of the government from subjecting an individual, like Ybarra, to retaliation for engaging in protected speech.

49. Ybarra exercised his free speech rights by telling Davis that he had entered the property illegally.

50. Davis retaliated against Ybarra by using excessive force. Davis threw Ybarra to the ground by the neck because Ybarra was exercising his free speech rights.

51. Davis had no non-retaliatory reason for violently throwing Ybarra to the ground. But for Ybarra exercising his right to free speech, Davis would not have thrown him to the ground.

52. Ybarra brings this claim pursuant to 42 U.S.C. § 1983.

D. **Fourth and Fourteenth Amendment § 1983 *Monell* Claim – as to Defendant Bastrop County Only**

53. Bastrop County, had the following policies, practices, or customs in place when Defendant Davis abused Plaintiff Ybarra:

   a. Failing to train deputies regarding when suspects are required to produce identification;

    b. Failing to train deputies that tackling suspects by the neck was extraordinarily dangerous; and,

    c. Requiring citizens to provide identification when citizens have no legal obligation to do so.

54. Each of the policies, practices, or customs delineated above was actually known, constructively known and/or ratified by Bastrop County and Sheriff Cook (the policymaker), and was promulgated with deliberate indifference to Ybarra's Fourth and Fourteenth Amendment rights under the United States Constitution. Moreover, the known and obvious consequence of these policies, practices, or customs was that Bastrop County Sheriff's deputies would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

55. Consequently, the policies delineated above were a moving force of Plaintiff's constitutional deprivations and injuries, and proximately caused severe damages.

56. Likewise, though Davis' actions were known to Bastrop County's policymakers, including Sheriff Cook, Davis was not disciplined or retrained in any way. Thus, Bastrop County ratified Davis' illegal actions.

57. Ybarra brings this claim pursuant to 42 U.S.C. § 1983.

## V.    Damages

58. Plaintiff Ybarra seeks the following compensatory damages:

    a. Past and future economic damages, including (but not limited to) lost wages;

    b. Past and future physical pain;

    c. Past and future mental anguish;

    d. Attorneys' fees, including costs, expert fees, and attorneys' fees pursuant to 42 U.S.C. § 1988;

    e. Past and future damages for injury to Plaintiff's character and reputation;

    f. Pre-judgment and post-judgment interest at the highest rates allowable under the law;

    g. All other compensatory and/or general damages to which Ybarra is entitled under state or federal law; and,

    h. Punitive damages in the highest amount allowed by law, against Defendant Davis only.

## VI.   JURY DEMAND

59. Plaintiff respectfully requests a trial by jury.

## VII.   PRAYER FOR RELIEF

60. To right this grave injustice, Plaintiff requests the Court:

    a. Award compensatory and punitive damages to the Plaintiff, against Defendant;

    b. Award Plaintiff costs, including expert fees and attorneys' fees pursuant to 42 U.S.C. § 1988;

    c. Award pre-judgement and post-judgment interest at the highest rate allowable under the law; and,

    d. Award and grant such other just relief as the Court deems proper.

Dated: November 12, 2019.

Respectfully submitted,

**EDWARDS LAW**
1101 East 11th Street
Tel.  512-623-7727
Fax.  512-623-7729

By  /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
jeff@edwards-law.com
SCOTT MEDLOCK
State Bar No. 24044783
scott@edwards-law.com

**ATTORNEYS FOR PLAINTIFFS**