IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ERIC YBARRA, | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:19-CV-1099-RP |
| DEREK DAVIS, *in his individual capacity*, and BASTROP COUNTY, | § § § § | |
| Defendants. | § § | |

**ORDER**

Before the Court is Derek Davis ("Davis") and Bastrop County's (together "Defendants") Motion to Dismiss, (Dkt. 6), Plaintiff Eric Ybarra's ("Ybarra") response, (Dkt. 8), Defendants' reply, (Dkt. 9), and Ybarra's surreply, (Dkt. 11). Having considered the parties' briefs, the record, and the relevant law, the Court will deny the motion.

**I. BACKGROUND**

Ybarra pleads the following facts in his complaint. (Compl., Dkt. 1). As Ybarra and his girlfriend were returning to his home in Bastrop, Ybarra stopped his motorcycle at the gate of his property when Defendant Davis, a Bastrop County Sheriff's Deputy, drove by in a squad car. (*Id.* at 2). Ybarra and his girlfriend then entered the gate, with Ybarra going to park the motorcycle at the house and his girlfriend remaining to close the gate. (*Id.*). "Circling back around," Davis stopped his squad car at Davis's closed gate. (*Id.*). Davis then told Ybarra's girlfriend to open the gate, and upon hearing "his girlfriend and Davis arguing," Ybarra left from his house and approached the fence. (*Id.* at 2–3). Davis "demanded that Ybarra produce his identification"; however, Ybarra had "just left his identification in the house." (*Id.* at 3).

Davis then jumped over the fence. (*Id.*). Ybarra objected to Davis entering, requested that he leave, and "informed Davis that his actions were illegal" and that "Davis was breaking the law." (*Id.*).

1

Davis again requested that Ybarra produce identification. (*Id.*). Ybarra then asked to speak with Davis's supervisor. (*Id.*). Davis then grabbed Ybarra's arm and told him he was under arrest. (*Id.*). Ybarra put his hands behind his back and Davis handcuffed him. (*Id.*).

Davis then walked Ybarra back towards the squad car that was on the other side of the fence, arriving at the locked gate. (*Id.* at 4). During the walk and at the gate, Ybarra "continued telling Davis that his actions were illegal, and that Davis was violating Ybarra's constitutional rights." (*Id.*). Ybarra also told Davis that the gate key was inside the house. (*Id.*). As Ybarra continued "to tell Davis that he had illegally entered the property," Davis put his arm around Ybarra's neck and threw him to the ground. (*Id.*). Davis then climbed on top of Ybarra, pressed Ybarra's chest into the ground, and "screamed 'stop resisting.'" (*Id.*). Ybarra was not resisting and said "Dude, I didn't resist at all," "can you get off me, please," and "officer, please get off me? I can't breathe." (*Id.*). In the process, Davis broke three of Ybarra's ribs. (*Id.*).

Ybarra has brought 42 U.S.C. § 1983 claims against Davis in his individual capacity for excessive force and illegal entry under the Fourth and Fourteenth Amendment and for retaliation under the First Amendment. (*Id.* at 5–6). Ybarra also brought Section 1983 municipal liability claims against Bastrop County under the Fourth and Fourteenth Amendments. (*Id.* at 6–7). Ybarra seeks damages, including "[p]unitive damages . . . against Defendant Davis only." (*Id.* at 8).

Defendants seek to dismiss the illegal entry and retaliation claims against Davis under Federal Rule of Civil Procedure 12(b)(6) on the basis of qualified immunity. (Mot. Dismiss, Dkt. 6, at 1–2). Defendants also seek to dismiss the municipal liability claim against Bastrop County under Rule 12(b)(6) for failing to allege that the official policy or custom was the moving force behind the alleged violations. (*Id.* at 2).

## II. LEGAL STANDARD

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to

dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### III. DISCUSSION

Defendants seek to dismiss Ybarra's Fourth Amendment illegal entry and First Amendment retaliation claims against Davis under Rule 12(b)(6) on the basis of qualified immunity. (Mot. Dismiss, Dkt. 6, at 1–2). Defendants also seek to dismiss the municipal liability claim against Bastrop County under Rule 12(b)(6) for failing to allege that the official policy or custom was the moving force behind the alleged violations. (*Id.* at 2). The Court will address each in turn.

#### A. Fourth Amendment Illegal Entry

Ybarra pleads a claim for illegal entry because Davis jumped over his fence without a valid warrant, without consent, and without any exigent circumstances. (Compl., Dkt. 1, at 5–6). Ybarra brings this claim under Section 1983 as a violation of his Fourth and Fourteenth Amendment rights. (*Id.*). Defendants argue that Davis is entitled to qualified immunity from Ybarra's illegal entry claim. (Mot. Dismiss, Dkt. 6, at 4). To evaluate whether Davis is entitled to qualified immunity, the Court must first determine whether Ybarra alleges a violation of a "clearly established" constitutional right and second whether Davis's conduct was "objectively unreasonable." *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004).

First, it is clearly established that warrantless entry into the curtilage of a home is unconstitutional. *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) ("[T]he Fourth Amendment's protection of curtilage has long been black letter law."). Defendants incorrectly argue that "'illegal entry' to land is not a constitutional violation." (Reply, Dkt. 9, at 1). On the contrary, the Fifth Circuit has held that, "[u]nder the Fourth Amendment, a warrantless intrusion into a person's home is 'presumptively unreasonable unless the person consents, or unless probable cause and exigent

4

circumstances justify' the intrusion." *Rockwell v. Brown*, 664 F.3d 985, 994–96 (5th Cir. 2011) (analyzing a warrantless entry claim separately from a warrantless arrest claim).

Second, Ybarra has sufficiently alleged facts in his complaint to state a claim of illegal entry, showing that Davis was objectively unreasonable. "[T]o state a plausible claim for [unlawful entry], a plaintiff must plead little more than the following facts: (1) the officer entered the home; (2) there was no warrant; and (3) there was no emergency or other justification for entering the home." *Sanchez v. Gomez*, No. EP-17-CV-133-PRM, 2017 WL 3842137, at *4 (W.D. Tex. Sept. 1, 2017). Ybarra's complaint alleges that Davis jumped over the fence without a warrant or exigent circumstances. (Compl., Dkt. 1, at 5–6). Defendants have not alleged that there were any exigent circumstances, but instead argue that Davis had probable cause to conduct a warrantless arrest for a misdemeanor conducted within his presence. (Mot. Dismiss, Dkt. 6, at 5). However, this is not sufficient to justify entry into the curtilage of a person's home. *Collins*, 138 S. Ct. at 1670 ("[O]fficers may not enter a home to make an arrest without a warrant, even when they have probable cause.").

However, parties disagree over whether Davis entered the curtilage of Ybarra's home when he jumped over the fence. (Mot. Dismiss, Dkt. 6, at 5–6; Resp., Dkt. 8, at 5–8). Ybarra contends that the area within the fence was considered curtilage to his home and was thus unlawful. (Resp., Dkt. 8, at 5–8). Defendants argue the complaint's description of the fence and property is insufficient to establish it was within the curtilage of the home. (Mot. Dismiss, Dkt. 6, at 6).

Whether an area is curtilage is "resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *U.S. v. Dunn*, 480 U.S. 294, 301 (1987). These *Dunn* factors are not to be "mechanically applied" but help determine

"whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection." *Id.*

The complaint has alleged sufficient facts to infer that Davis unlawfully entered the curtilage of the home without a warrant. All four *Dunn* factors weigh in favor of Ybarra, but particularly the first two—the proximity of the area to the home and whether the area is within an enclosure surrounding the home. Although not explicitly stated, the complaint adequately describes the property and events for the Court to infer that that the area Davis entered was enclosed by the fence and sufficiently close to Ybarra's home. (*See* Compl., Dkt. 1, at 2–5); *Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable *inference* that the defendant is liable.") (emphasis added). Regarding the first *Dunn* factor, the distance between the house and the gate must have been short enough for Ybarra, at the house, to hear his girlfriend arguing with Davis at the gate and for Ybarra and his girlfriend to walk between the gate and house at various times while interacting with Davis. (*Id.* at 2–3). The complaint also describes the distance from the location of the arrest to the squad car, just outside the gate, as a "short distance." (*Id.* at 3–4). Similarly, regarding the second *Dunn* factor, whether the area was enclosed, the gate and fence likely enclosed the area around the home if Davis found the need to jump over the fence to approach Ybarra, (Compl., Dkt. 1, at 3), and if Davis "need[ed] a key to open the gate to the fence so that he could exit the property." (*Id.* at 4).

As to the third *Dunn* factor, how the area is used, the complaint describes Ybarra and his girlfriend using the area as an entrance to the home. (Compl., Dkt. 2). There is no indication the area is accessible to the public, considering it was behind a locked gate. (*Id.*); *cf United States v. Kessler*, 165 F.3d 24 (5th Cir. 1998) ("Areas that are accessible to the public . . . are afforded less protection than residences."). Ybarra correctly explains that that fourth *Dunn* factor is less relevant, because this case is not about visibility into the property, but entering the property. (Resp., Dkt. 8, at 7); *Collins*, 138 S.

Ct. at 1675 ("The ability to observe inside curtilage from a lawful vantage point is not the same as the right to enter curtilage without a warrant."). Thus, the Court can infer from the complaint that when Davis jumped over the fence, he entered the curtilage of Ybarra's house. Because Ybarra has pled sufficient facts for a clearly established Fourth Amendment violation, Davis is not entitled to qualified immunity. The Court will not dismiss this claim.

### B. First Amendment Retaliation

Ybarra also pleads a First Amendment retaliation claim against Davis for use of force.[1] (Compl., Dkt. 1, at 6). Ybarra alleges that after Davis had handcuffed Ybarra and walked him to the gate, Davis threw Ybarra to the ground by his neck for "exercising his free speech rights by telling Davis that he had entered the property illegally." (*Id.*). Defendants argue that Davis is entitled to qualified immunity from this claim, (Mot. Dismiss, Dkt. 6, at 1–2), and that Ybarra's First Amendment claim for retaliatory force should be precluded, because the Fourth Amendment excessive force claim is based on the same set of facts. (Reply, Dkt. 9, at 3–4).

Ybarra's First Amendment claim is not precluded. Defendants argue that *Graham v. Connor*, 490 U.S. 386 (1989), precludes First Amendment claims based on excessive force. (Compl., Dkt. 1, at 6; Reply, Dkt. 9, at 3). However, *Graham* does not state that a claim based on excessive force may only be brought under the Fourth Amendment. Instead, *Graham* explains that a Section 1983 claim requires applying the standard for the constitutional right that has been alleged to be violated, not a more general standard:

> We reject this notion that all excessive force claims brought under § 1983 are governed by a single generic standard. As we have said many times, § 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." In addressing an excessive force claim brought under § 1983, analysis begins by

---

[1] Defendants' motion to dismiss initially argued that Ybarra had not adequately pled a retaliatory arrest claim. (Mot. Dismiss, Dkt. 6, at 7). However, Ybarra has pled a claim for retaliatory use of force, not an arrest. (Response, Dkt. 8, at 8). Retaliation claims may be brought even without false arrest claims. *White v. Jackson*, No. 7:13-CV-0050-O, 2014 WL 99976, at *11 (N.D. Tex. Jan. 10, 2014) (denying a motion to dismiss for retaliatory use of excessive force, regardless of whether there was probable cause for the arrest, as Plaintiff was "not alleging a retaliatory arrest").

>identifying the specific constitutional right allegedly infringed by the challenged application of force. In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct. The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized "excessive force" standard.

*Graham*, 490 U.S. at 394 (citations omitted). In this case, Ybarra has not alleged a generic standard or a "generalized notion of substantive due process." (*See id.* at 395). Instead, Ybarra has brought a claim of retaliation under the First Amendment. (Compl., Dkt. 1, at 6). Consistent with *Graham*, this claim should be "judged by reference to the specific constitutional standard which governs that right," *Graham*, 490 U.S. at 394, which is the First Amendment. Although *Graham* explains that "in most instances," excessive force claims will be brought under the Fourth Amendment, as Ybarra has also done, *Graham* does not foreclose the possibility that law enforcement's use of force will also violate another specific constitutional right[2]—such as the First Amendment. *See id.*

Defendants further rely on *Price v. Elder*, 175 F. Supp. 3d 676 (N.D. Miss. 2016), which did extend *Graham* to preclude a First Amendment retaliation claim based on force. *Id.* at 678–79. The court in *Price* reasoned that:

>[a] narrow reading of *Graham* would suggest that only the "more generalized" legal theory of "substantive due process" would be usurped by the Fourth Amendment, and that the reasoning would not extend to First Amendment cases such as this. But in *Tennessee v. Garner*, the case on which the Graham Court explicitly relied, the Supreme Court exclusively conducted a Fourth Amendment analysis even though the complaint also alleged violations of due process and other constitutional provisions, namely the Sixth and Eighth Amendments.

*Id.* (citations omitted). This Court finds this interpretation of *Graham* unpersuasive. *Tennessee v. Garner*, 471 U.S. 1 (1985), was an appeal from the Sixth Circuit. *Id.* at 5. The Sixth Circuit had held that a Tennessee statute unconstitutionally violated the Fourth and Fourteenth Amendment. *Garner*

---

[2] *Graham* does state that an excessive force claim may not be brought under the broader standard of the Due Process Clause, but Ybarra has not done so. *Graham*, 490 U.S. at 388.

*v. Memphis Police Dep't*, 710 F.2d 240, 241 (6th Cir. 1983), *aff'd and remanded sub nom. Tennessee v. Garner*, 471 U.S. 1 (1985). Thus, the Supreme Court's Fourth Amendment analysis in *Garner* reflects that it was the constitutional issue on appeal, not that another constitutional claim would be precluded.

Defendants also rely on *Anderson v. Franklin Cty.*, 192 F.3d 1125 (8th Cir. 1999), for the proposition that excessive force claims may not be brought as First Amendment retaliation claims. (Reply, Dkt. 9, at 3). In *Anderson*, the Eight Circuit held that "no cognizable § 1983 First Amendment claim [had] been asserted" despite the plaintiff asking for a warrant. *Anderson*, 192 F.3d at 1132. However, the relationship between the protected speech and the excessive force in *Anderson* is more tenuous—separated by an ongoing altercation between plaintiff and law enforcement. *See id.* at 1128. After the plaintiff asked the officer whether he had a warrant, the officer took a weapon from the plaintiff after "several attempts," the officer struck the plaintiff with his vehicle three times and drove several feet with the plaintiff on the vehicle's hood, and another officer arrived on the scene and maced the plaintiff after he refused to follow her instructions to put his hands on the hood of the car. *Id.* While the Eight Circuit may have viewed the force in *Anderson* as only implicating the Fourth Amendment, the same is not true in this case. Ybarra has pled that he had already been handcuffed and was not resisting arrest, and only after he continued to tell Davis that he had acted illegally was he thrown to the ground. (Compl., Dkt. 1, at 4). In this case, the facts more clearly lend themselves to a First Amendment claim and are not precluded by the Fourth Amendment.

Similarly, the facts in *Jenkins v. Town of Vardaman*, 899 F. Supp. 2d 536 (N.D. Miss. 2012), which Defendants rely on, (Reply, Dkt. 9, at 3), are distinguishable from this case. The court in *Jenkins* found that, while "[i]t may be true that there are other contexts in which the use of force by a police officer could validly be considered in the context of a First Amendment retaliation," the First Amendment claim in that case was precluded because the officer had used force clearly in the

process of making an arrest when he "told plaintiff he was under arrest, pulled the taser and shot plaintiff with it." *Jenkins*, 899 F.Supp.2d at 543. Whereas, in this case, Ybarra alleges he had already been handcuffed without resisting, and while being walked to the gate, continued to tell Davis that he "had illegally entered the property." (Compl., Dkt. 1, at 4). Only then did Davis allegedly put his arm around Ybarra's neck and throw him to the ground. (*Id.*). The Court is unpersuaded by the analysis in *Jenkins* and *Anderson* that force in an arrest context is exclusively a Fourth Amendment issue, but to the extent that a First Amendment claim could be precluded in some scenarios, the facts of this case sufficiently plead a standalone First Amendment claim.

Ybarra, in contrast, relies on *White v. Jackson*, No. 7:13-CV-0050-O, 2014 WL 99976 (N.D. Tex. Jan. 10, 2014), where the court held that "use of excessive force was in retaliation for . . . exercise of [plaintiff's] First Amendment right to free speech." *Id.* at *11; (Surreply, Dkt. 11, at 2). In *White*, the officer used force against the plaintiff when he was "already under arrest and handcuffed" and "almost contemporaneous[ly] with [plaintiff] telling his dad to call his attorney." *Id.* The court, also at the motion to dismiss stage, found that plaintiff "adequately alleged that [the officer's] use of excessive force was in retaliation for [plaintiff's] exercise of his First Amendment right to free speech." *Id.* Similarly here, the complaint alleges that Davis put his arm around Ybarra's neck and put him on the ground after he was handcuffed and being walked to the gate, during which Ybarra was telling him he "had illegally entered the property." (Compl., Dkt. 1, at 4). Like *White*, Ybarra's complaint has pled facts that plausibly assert that the excessive force in this case, which happened after Ybarra was in handcuffs and had been arrested, was a result of Ybarra telling Davis he had acted illegally. *See id.* Separate from the Fourth Amendment excessive force claim, this claim specifically involves retaliatory conduct for protected speech and thus Ybarra's First Amendment claim is not precluded.

Therefore, Davis is not entitled to qualified immunity from Ybarra's First Amendment claim. Fifth Circuit precedent clearly establishes that it is a First Amendment violation if an officer retaliates against someone in response to protected speech. *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (citing *Lewis v. City of New Orleans*, 415 U.S. 130, 134–35 (1974) (Powell, J., concurring)) ("Trained officers must exercise restraint when confronted with a citizen's anger over police action."); *Keenan v. Tejada*, 290 F.3d 252, 258 (5th Cir. 2002) ("The First Amendment prohibits . . . adverse governmental action against an individual in retaliation for the exercise of protected speech activities."); *see City of Hous. v. Hill*, 482 U.S. 451, 462 (1987) ("[The] First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.").

Additionally, Ybarra has sufficiently pled that his First Amendment right was violated. To assert a claim for retaliation under Section 1983, plaintiffs must show "(1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." *Keenan*, 290 F.3d at 258.

First, Ybarra has plausibly pled that he was engaged in constitutionally protected activity under the First Amendment when he told Davis that he was behaving illegally. (Compl., Dkt. 1 at 7); *see City of Hous. v. Hill*, 482 U.S. 451, 462–63 (1987) ("[The] First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."). Second, it is plausible that being thrown to the ground by the neck and having three broken ribs would chill a person of ordinary firmness from engaging in similar protected speech. (Compl., Dkt. 1, at 4); *see Brooks v. City of West Point*, 639 F. App'x 986, 987 (5th Cir. 2016) ("[A]rrest for cursing a police officer was an injury that would chill the speech of a person of ordinary firmness."). Third, Ybarra has plausibly pled that Davis threw Ybarra to the ground and used force because of Ybarra's speech. Ybarra pled

11

that "Davis had no non-retaliatory reason" to throw Ybarra to the ground, and that "[b]ut for Ybarra exercising his right to free speech, Davis would not have thrown him to the ground." (Compl., Dkt. 1, at 6; Response, Dkt. 8, at 10).

Accordingly, Ybarra has stated a plausible claim for relief under the First Amendment for retaliatory use of excessive force and Davis is not entitled to qualified immunity. The Court will not dismiss that claim.

### C. Municipal Liability Claims

#### 1. *Monell*

Ybarra has also brought a Section 1983 *Monell*[3] claim, alleging that Bastrop County had a policy, practice, or custom of requiring citizens to provide identification when they were not legally obligated to.[4] (Compl., Dkt. 1, at 6–7). To bring a *Monell* claim, a plaintiff must show that "(1) an official policy and (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Pena v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018).

Defendants move to dismiss this *Monell* claim. (Mot. Dismiss, Dkt. 6, at 7–9). Defendants claim that at the pleading stage, a complaint's "description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts." *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997). However, Ybarra correctly asserts that "Plaintiff has not had access to discovery, and is thus limited in his ability to specifically describe the policies, practices, and trainings of Bastrop County." (Resp., Dkt. 8, at 11). The Fifth

---

[3] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 690 (1978).
[4] In his response, Ybarra addresses all of the municipal liability claims under an umbrella of failing to train Davis. (Response, Dkt. 8, at 11–12). To the extent that Ybarra intended for his pleadings to only refer to a lack of training, those claims will fall under the failure to train standard of municipal liability, discussed below. However, on the face of the complaint, the requirement to show identification is pled as a policy distinct from any lack of training issues. (Compl., Dkt. 1, at 7).

Circuit does "not require a plaintiff to plead facts 'peculiarly within the knowledge of defendants.'" *Morgan v. Hubert*, 335 F. App'x 466, 472 (5th Cir. 2009).

Further, at the motion to dismiss stage, Ybarra's allegations must be accepted as true. *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993). Ybarra alleges that this policy was known to Bastrop County's policy maker, Sheriff Cook, and that the known and obvious consequence of the policy was that deputies would be placed in recurring situations where constitutional violations would occur. (Compl., Dkt. 1, at 7). Thus, Ybarra's complaint is sufficient to meet the first prong of *Monell* liability that there was an official policy. *See Colle v. Brazos County,* 981 F.2d 237, 245–46 (5th Cir. 1993) ("While the facts pleaded by [plaintiff] could support an inference that unconstitutional policies were the 'moving force' . . . the facts as presently pleaded only set the stage for further discovery.").

Likewise, the second prong of *Monell* liability is met because Ybarra pleads that the policy was known by the policy maker. (Compl., Dkt. 1, at 7). Finally, the pleadings satisfy the third prong of *Monell* because Davis's repeated requests to see Ybarra's identification, assuming that Ybarra was not in fact required to show his identification as pled in the complaint, led to the constitutional violation. (*See id.* at 3–4, 7).

Accordingly, Bastrop County may be liable for the actions of its officers undertaken pursuant to policy, practice, and/or custom of requiring individuals to provide identification when not legally obligated to do so. This claim will not be dismissed.

2. <u>Failure to Train</u>

Ybarra also contends that Bastrop County failed to train its deputies about when suspects are required to produce identification and that tackling suspects by the neck is dangerous. (*Id.* at 6–7). To avoid dismissal of a failure-to-train claim, a plaintiff must plead sufficient facts to show: "(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately

13

indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010).

First, Ybarra claims that, "Davis' training was obviously deficient and his conduct was obviously excessive," and that "Davis repeatedly instructed Ybarra to provide identification even though any reasonable police officer should have known Ybarra was not legally required to do so." (Resp., Dkt. 8, at 11). This is sufficient for the Court to infer that the training procedures were inadequate. *See Zarnow*, 614 F.3d at 170.

Second, the complaint is sufficient for the Court to infer that Bastrop County acted with deliberate indifference. *See id.* To state an actionable failure to train claim, Ybarra must plead facts to show Bastrop County was deliberately indifferent in adopting inadequate training procedures. *Id.* Specifically, Plaintiff must show that the need for more or different training was "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [Bastrop County] can reasonably be said to have been deliberately indifferent to the need." *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018).

Ybarra alleges that Bastrop County failed to train its deputies regarding identification and tackling by the neck. (Compl., Dkt. 1, at 6–7). An allegation of a complete failure to train on an issue "carries straightforward doctrinal consequences . . . we must assume that this is not a case in which 'an otherwise sound [training] program has occasionally been negligently administered,' or in which an officer received appropriate training that she then failed properly to obey." *Littell*, 894 F.3d at 627. Ybarra contends that the known and obvious consequence to the policy maker of the lack of training is that deputies would be placed in recurring situations in which a constitutional violation would result. (Compl., Dkt. 1, at 7). The allegations that Bastrop County failed to train its deputies regarding identification and tackling suspects by the neck is sufficiently similar to *Littell* where the Fifth Circuit recognized that plaintiffs had alleged deliberate indifference based on a complete failure

to train school district employees about their duty not to conduct unreasonable searches. 894 F.3d at 624.

Bastrop County should have known that its deputies would likely be in situations where they would ask suspects to produce identification or tackle suspects by the neck. If, taking Ybarra's pleadings as true, Bastrop County failed to train officers in either of these areas, then this Court may infer that Bastrop County acted with deliberate indifference. *See Littell*, 894 F.3d at 627 ("[A]nd if the school district nonetheless failed to provide those officials any legal training on the subject—then the factfinder will be entitled (but not required) to infer that the school district acted with deliberate indifference to its students' Fourth Amendment rights.").

Third, Ybarra has adequately pled that the inadequate training directly caused the violations in question by pleading that it was "a moving force of Plaintiffs constitutional deprivations and injuries, and proximately caused severe damages." (Compl., Dkt. 1, at 7); *see Zarnow*, 614 F.3d at 170. Therefore, Ybarra's lack of training claims are sufficiently pled to meet the standard for municipal liability and will not be dismissed.

### D. Punitive Damages

In his complaint, Ybarra seeks "[p]unitive damages in the highest amount allowed by law, against Defendant Davis only." (Compl., Dkt. 1, at 8). Defendants' Motion to Dismiss argues that "municipalities are immune from punitive damages awards under Section 1983." (Mot. Dismiss, Dkt. 6, at 9). However, Ybarra has not sought punitive damages against the City of Bastrop. (Compl., Dkt. 1, at 8). Therefore, the claim for punitive damages will not be dismissed.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Defendants' Motion to Dismiss, (Dkt. 6), is **DENIED**.

**SIGNED** on September 24, 2020.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE